RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0188p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

RANDY HAIGHT, et al.,

*Plaintiffs-Appellants,*

*v.*

No. 13-6005

LADONNA THOMPSON, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 5:11-cv-00118—Thomas B. Russell, District Judge.

Argued: May 9, 2014

Decided and Filed: August 15, 2014

Before: COLE, Chief Judge; SUTTON, Circuit Judge; CLELAND, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Jacob M. Roth, JONES DAY, Washington, D.C., for Appellants. Stafford Easterling, JUSTICE & PUBLIC SAFETY CABINET, Frankfort, Kentucky, for Appellees. **ON BRIEF:** Jacob M. Roth, JONES DAY, Washington, D.C., for Appellants. Stafford Easterling, JUSTICE & PUBLIC SAFETY CABINET, Frankfort, Kentucky, for Appellees.

SUTTON, J., delivered the opinion of the court, in which COLE, C.J., and CLELAND, D.J., joined. COLE, C.J. (pp. 20–23), delivered a separate concurring opinion.

_____

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

———————————

**OPINION**

———————————

SUTTON, Circuit Judge.   The Religious Land Use and Institutionalized Persons Act prohibits state and local governments from placing "a substantial burden" on the "religious exercise" of any inmate unless they establish that the burden furthers a "compelling governmental interest" and does so in the "least restrictive" way.   42 U.S.C. § 2000cc-1(a). Congress did not leave it to the National Government alone to enforce the law or to the whims of potential implied rights of action that might (or might not) allow inmates themselves to enforce the law.   It created a private cause of action that empowers inmates to obtain "appropriate relief" from those who violate the statute.   *Id.* § 2000cc-2(a).

Five death-row inmates, currently housed in a maximum-security prison in Kentucky, filed this lawsuit under the Act for a variety of reasons—some related to requests to practice their Native American faith, some related to a request for clergy visits.   They lost across the board before the district court, which granted summary judgment in favor of the relevant prison officials at each turn.   At this stage of the case, no one debates the sincerity of the inmates' religious beliefs.

The appeal presents three questions:   (1) Is there a triable issue of fact over whether RLUIPA gives the inmates a right to have access to a sweat lodge for faith-based ceremonies? (2) Is there a triable issue of fact over whether RLUIPA gives the inmates a right to buffalo meat and other traditional foods for a faith-based once-a-year powwow?   (3) Does RLUIPA permit inmates to collect money damages from prison officials sued in their individual capacities?   The answers, as we explain below, are yes, yes and no.

I.

A.

RLUIPA arose from the embers of two prior efforts to require the States to respect the faith-based practices of their citizens.   In the first, *Employment Division v. Smith*, 494 U.S. 872

(1990), Alfred Smith and Galen Black were fired from their jobs as counselors at a drug rehabilitation clinic because they had ingested peyote as part of a religious ceremony conducted by their Native American Church. When Smith and Black sought unemployment benefits, the State denied the benefits on the ground that they had been fired for misconduct, namely violating Oregon's criminal prohibition against possessing and using peyote. The Supreme Court rejected the individuals' claims that the Free Exercise Clause of the First Amendment, applicable to the States through the Fourteenth Amendment, prevented the State from penalizing their faith-based practices. The reason? A State does not violate the free exercise rights of its citizens when it enforces "neutral" and "generally applicable" laws—laws in other words that apply to everyone regardless of their faith or lack of faith. *Id.* at 878–82.

The second effort arose from Congress's response to *Smith*, a legislative measure that sought to provide greater protections for religious practices than those offered by the First and Fourteenth Amendments. *See* Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb *et seq.* The Act, RFRA as it has come to be known, imposed strict scrutiny on all governmental burdens placed on individuals' religious practices, even those arising from generally applicable laws. *Id.* § 2000bb-1. In *City of Boerne v. Flores*, 521 U.S. 507 (1997), however, the Court faced a challenge to Congress's authority to enact RFRA in the context of a city's rejection of a church's application to expand the size of its church, which by then had been designated an historic landmark under state law. The Court invalidated the law as applied to the States (though not the Federal Government) because it exceeded Congress's enforcement authority under Section 5 of the Fourteenth Amendment to impose "congruent and proportional" legislation on the States to remediate or ward off free-exercise violations. *Id.* at 529–36.

In the aftermath of Smith's and Black's unsuccessful free exercise claims in *Smith* and in the aftermath of Congress's unsuccessful efforts in RFRA to impose strict scrutiny on state and local governments regulating religious practices and religious institutions, Congress tried again. In 2000, it passed the Religious Land Use and Institutionalized Persons Act. Instead of enacting a law applicable to all state laws, it enacted one applicable only to state and local regulations of inmates and land use. And instead of invoking its Section 5 enforcement powers, it invoked its Spending and Commerce Clause powers.

As relevant here, RLUIPA, as it has come to be known, applies to prisons that receive federal funds and prohibits state and local governments from placing "a substantial burden" on the "religious exercise" of any inmate unless they establish that the burden furthers a "compelling governmental interest" and does so in the "least restrictive" way. 42 U.S.C. § 2000cc-1(a). To establish a cognizable claim under RLUIPA, the inmate must first demonstrate that a prison policy substantially burdens a religious practice. So long as the practice is traceable to a sincerely held religious belief, *see Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005), it does not matter whether the inmates' preferred exercise is "central" to his faith, 42 U.S.C. § 2000cc-5(7)(A). Once an inmate makes this showing, the prison policy survives only if it serves a compelling governmental interest in the least restrictive way. *Id.* § 2000cc-1(a).

B.

Two groups of death-row inmates, all held in a maximum-security prison in Kentucky, filed this lawsuit under RLUIPA. The first group, Robert Foley, Roger Epperson and Vincent Stopher, claim that prison officials violated the Act by denying them access to a sweat lodge for religious ceremonies and refusing to provide traditional foods for Native American religious ceremonies. The inmates offered to pay for the lodge, which is "a hut . . . or cavern heated by steam from water poured on hot stones and used . . . by [Native Americans] for ritual or therapeutic sweating." Webster's Third New International Dictionary 2308. The warden denied the inmates' grievance in January 2010, writing that the Kentucky Department of Corrections "has not approved . . . a sweat lodge at other prisons, so this would be a first, if granted." R. 1-6 at 4–5, 8. The inmates appealed the warden's decision to the state commissioner, who said in February 2010 that "[a] final decision has not been made yet and this issue needs to be investigated further." *Id.* at 10. The commissioner promised a decision "in the near future," *id.*, which apparently means more than four years, as he has not issued a decision yet.

The three inmates also requested Native American foods for their annual powwow—a "day of . . . dancing, speaking, and praying in word, song, and music" accompanied by a "traditional" meal. R. 46 at 45. The inmates made repeated requests to purchase food for this meal, including buffalo meat and corn pemmican, and offered to pay for the food themselves.

The prison denied each request, though they did provide "special traditional bread" for the meal. *See, e.g.*, R. 1-6 at 17. When the inmates filed several grievances asking for other traditional foods at the ceremony, the warden and commissioner rejected their complaints.

The district court ruled against the inmates. It granted summary judgment to the prison officials on the sweat-lodge and ceremonial-foods requests, holding that the inmates failed as a matter of law to support their claims under RLUIPA.

The second group of inmates, Randy Haight and Gregory Wilson, contend that prison officials violated RLUIPA when they failed to facilitate inmate access to visiting clergy members. Before June 2010, the Kentucky State Penitentiary had regularly granted visiting clergy members the opportunity to see prison inmates under a "special visit" exception to the prison visitation policy. *See* R. 1-1 at 35–36. But the practice changed when prison officials discovered that it conflicted with statewide prison procedures. Under the new policy, the prison required visiting clergy members to go through the usual visitation process: Their names had to "appear[] on the [inmate's] approved visitation list," and their names could not appear "on more than one . . . inmate['s] list" at a time. R. 32-1 at 4. The prison temporarily suspended all clergy visits for several weeks in the summer of 2010. In response, Haight and Wilson exhausted the prison's grievance procedures and filed this lawsuit in federal court, seeking injunctive relief and money damages.

While the lawsuit was pending, the State changed its visitation policy again. Under the (new) new policy, members of the clergy could appear on more than one inmate's visitation list, and they could visit more than one inmate on each prison visit. All of this satisfied the inmates' request for action, and accordingly the district court dismissed the inmates' request for injunctive relief as moot. It then dismissed the rest of the claim after concluding that RLUIPA does not permit money-damages claims against the state officials. *Haight v. Thompson*, 2013 WL 1092969, at *6, *8 (W.D Ky. Mar. 15, 2013).

All five inmates appealed—the first three on the ground that summary judgment was premature in view of several material fact disputes, the second two on the ground that RLUIPA permits money-damages claims against state officials sued in their individual capacity.

II.

At the outset, we need to clear some brush surrounding the inmates' request to obtain access to a sweat lodge. The commissioner of the Kentucky Department of Corrections, as noted, has not yet issued a final statewide report on the issue. Does this mean that the inmates failed to exhaust their administrative remedies, as required under the Prison Litigation Reform Act? *See* 42 U.S.C. § 1997e(a). Not in this instance. "[A]dministrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance." *Boyd v. Corr. Corp. of Am.*, 380 F.3d 989, 996 (6th Cir. 2004). The inmates met their end of the bargain by requesting a ruling. Four-plus years later, they have nothing to show for it. That is the commissioner's problem, not theirs, and the absence of a response by the State does not permit the commissioner to argue that the inmates failed to exhaust their administrative remedies.

Turning to the merits, RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to [a prison] . . . unless the government demonstrates that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). In rejecting the inmates' claim, the district court reasoned that "the prohibition [on a sweat lodge] furthers the government's compelling interest in safety and security at a maximum security prison, and even though the prohibition is absolute, it is carried out in the least restrictive means possible." *Haight*, 2013 WL 1092969, at *11.

Although this analysis says the right things, they are not things the district court could say on this summary judgment record. Start with the court's assessment that the prison's policy served "the government's compelling interest in safety and security at a maximum security prison." This conclusion lacks the kind of evidentiary support that RLUIPA requires. All that exists from a pre-litigation perspective is the warden's response that "this would be a first." "To [his] knowledge," he elaborated, the Kentucky Department of Corrections had never "approved . . . a sweat lodge at other prisons, so this would be a first, if granted," and thus "whatever is decided on your grievance would likely set a preceden[t] for other prisons in [Kentucky]." R. 1-6 at 8. That a request to accommodate a religious practice has no precedent

cannot by itself justify the warden's action. The point of RLUIPA was to inaugurate a series of "first[s]" by extending through a statute the protections offered to the free-exercise rights of inmates beyond those offered under the Constitution. When Congress offers *new* free-exercise protections from the State for their citizens, as it did in enacting RLUIPA in 2000, it should come as no surprise that the State cannot deny an accommodation request on the ground that the request is . . . new.

Nor does the warden strengthen his claim by warning that, if he grants this accommodation, he will have to grant others, having set a precedent with the "first" accommodation. In the context of construing RFRA, a nearly identical statute that remains applicable to the federal government, and in the context of granting relief to a faith group that wished to use federally banned hallucinogens in its ceremonies, the Supreme Court already rejected a like-minded contention. This kind of argument, as the Chief Justice put it, represents "the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006). Just as a no-exceptions policy failed to work in *O Centro*, it fails to work here on this threadbare record. Keep in mind that the idea behind offering statutory protection for faith-based practices is to make accommodations—exceptions—for individuals who believe they must do certain things because their faith requires it. Rejecting accommodation requests on the ground that an exception to a general prison policy will make life difficult for prison wardens is a fine idea in the abstract and may well be a fine idea under *Smith*. But it has no place as a stand-alone justification under RLUIPA.

The prison officials add several after-the-fact explanations for denying the request for access to a sweat lodge. Yet explanations offered for the first time in litigation ought to come with a truth-in-litigating label, requiring the official to disclose whether the new explanations motivated the prison officials at the time of decision or whether they amount to post hoc rationalizations. Only the true explanations for the policy count. *See, e.g., Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) ("To be a compelling interest, the State must show that the alleged objective was the . . . 'actual purpose' for the [government's action]."). Although various prison officials now claim that they denied the inmates' sweat-lodge request for "security" reasons, *see*,

*e.g.*, R. 32-2 at 1, these claims appear only in affidavits that form the litigation record in the case, not the record memorializing the prison's decision-making process in response to the inmates' grievance. Nobody wrote, swore to or signed an affidavit until after the inmates named them as defendants in this lawsuit. A genuine issue of material fact exists over whether these affidavits represent the true explanations for the warden's decision, as required. *See Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 39 (1st Cir. 2007); *cf. United States v. Virginia*, 518 U.S. 515, 533 (1996) (noting that, in the context of a gender-discrimination dispute where "heightened" review applies, the government's asserted interest "must be genuine, not hypothesized or invented *post hoc* in response to litigation").

Even on their own terms, the prison officials' affidavits suffer. They discuss security at a cloud-level height of abstraction, far too high to establish as a matter of law that a compelling interest undergirds the decision. Many of the affidavits simply mention "security" and leave it at that—without elaboration, without explanation. *See, e.g.*, R. 32-2 at 1, 5, 13. Even the most specific affidavit describes the prison's security concerns in the barest of terms. "[A] sweat lodge cannot be placed in a maximum security prison," the deputy commissioner of the Kentucky Department of Corrections submits, because prison staff must be able to "immediate[ly] observe[]" inmates to avoid any "breach of security," "danger" to inmates, or "medical" problems. *Id.* at 3. How, however, is this a complete answer? Would not a security camera solve the problem, as the inmates point out? Reply Br. at 19. How do prison staff monitor inmates in other discreet settings such as a shower facility, as the inmates also point out? *Id.* Beyond these inquiry-inducing statements, we know next to nothing about why a sweat lodge presents a compelling security problem as to "that" particular group of inmates—the inmates who made the request and who filed this lawsuit. 42 U.S.C. § 2000cc-1(a). RLUIPA requires more.

The record also shows no effort to take the most obvious route to studying this issue: looking at how other prisons have dealt with these requests. Many other States, it turns out, permit Native American inmates to have access to sweat lodges for religious ceremonies. *See, e.g.*, *Cubero v. Burton*, 96 F.3d 1450, 1450 (7th Cir. 1996) (unpublished) (Wisconsin); *Allen v. Toombs*, 827 F.2d 563, 565 n.5 (9th Cir. 1987) (Oregon); *Brown v. Schuetzle*, 368 F. Supp. 2d

1009, 1011–12 (D.N.D. 2005) (North Dakota); *Youngbear v. Thalacker*, 174 F. Supp. 2d 902, 912 (N.D. Iowa 2001) (Iowa); *Indian Inmates v. Gunter*, 660 F. Supp. 394, 398 (D. Neb. 1987) (Nebraska); *Mathes v. Carlson*, 534 F. Supp. 226, 228 (W.D. Mo. 1982) (Missouri). Yet, for reasons of their own, the prison officials never studied how these accommodations worked and whether they posed serious security risks or whether the prisons found ways to alleviate these risks. On this record, we cannot say that an absolute prohibition on sweat lodges serves a compelling government interest when other States allow prison inmates access to them.

While the Kentucky prison officials thus far have refused to explain how and under what circumstances other States have accommodated requests for access to sweat lodges, they have been more than happy to look at a RLUIPA case from another State involving such a claim. Even this selective citation does not close the gaps in this record. In *Fowler v. Crawford*, it is true, the Eighth Circuit held that prohibiting a sweat lodge at a maximum-security facility did not violate RLUIPA. 534 F.3d 931, 942 (8th Cir. 2008). There, however, the inmate submitted a far more inflexible request, asking that the sweat lodge be outside, be of only a certain type and be available for use a minimum of 17 times a year. *Id.* at 933–34, 940. By contrast, the inmates here have offered to work with the warden in providing access to a lodge with far fewer restraints. There, moreover, the prison officials articulated a context-specific security interest. The prison had a history of violence and sexual misconduct during religious ceremonies, and the Missouri inmates demanded access to deer antlers, rocks, shovels and split wood—all potential weapons. *See id.* at 935. In Kentucky, by contrast, we know only that "security" in the vaguest sense of the word, and seemingly after the fact, played a role in the prison's decision. "Just because other prisons may have had a compelling interest in denying access to a sweat lodge in other circumstances doesn't necessarily prove, without more, that all prisons have a compelling interest in denying access to sweat lodges in all circumstances." *Yellowbear v. Lampert*, 741 F.3d 48, 58 (10th Cir. 2014). RLUIPA requires the courts to weigh the government's compelling interest against "the burden on *that* person" bringing a claim, 42 U.S.C. § 2000cc-1(a), which is to say, broad generalities about the government's interest unmoored from the particularities of *this* case will not suffice. *See O Centro*, 546 U.S. at 431 (reaching a similar conclusion in construing similar language in RFRA); *see also Yellowbear*, 741 F.3d at 57–58.

*Fowler*, moreover, does not stand alone.  There are other cases that deny summary judgment motions filed by prison officials in the context of access-to-sweat-lodge requests, including one from the Eighth Circuit, and some that find as a matter of law that the government does not have a compelling interest in an absolute prohibition.  *See, e.g.*, *Yellowbear*, 741 F.3d at 56–62; *Pounders v. Kempker*, 79 F. App'x 941, 942–43 (8th Cir. 2003) (per curiam); *Chernetsky v. Nevada*, -- F. Supp. 2d --, 2014 WL 910355, at *1 (D. Nev. Mar. 7, 2014) (slip op.); *Farrow v. Stanley*, 2005 WL 2671541, at *9 (D.N.H. Oct. 20, 2005); *Youngbear*, 174 F. Supp. 2d at 915.

What of the second prong of the strict scrutiny test?  Here, too, the court says the right thing:  The "prohibition . . . is carried out in the least restrictive means possible."  *Haight*, 2013 WL 1092969, at *11.  But here, too, the record does not support the conclusion, at least at the summary-judgment phase of the case.  The inmates' request came with several accommodations of their own:  They would pay for the lodge; it could be permanent or portable; the timing and number of ceremonies could be flexible; and whatever safety and security procedures the prison wanted, the inmates would follow.  All that the prison officials have said in response is that "a sweat lodge cannot be placed in a maximum security prison," full stop.  R. 32-2 at 3.  Maybe this is true.  But maybe it is not, as other cases suggest.  *See Allen*, 827 F.2d at 565–66 & n.5 (describing sweat lodge used weekly at a maximum-security prison in Oregon); *Native Am. Council of Tribes v. Weber*, 897 F. Supp. 2d 828, 852 (D.S.D. 2012) ("[T]here have been no security problems at sweat lodge ceremonies in 31 years.").  The salient point is that, in the absence of evidence demonstrating (as opposed to lawyer arguments speculating) that the prison considered and rejected alternatives more tailored to its security interest, the prison's prohibition cannot withstand this aspect of strict scrutiny.  *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2740–41 (2011).  A remand is required, as this claim needs further consideration, further discovery and, perhaps finally, further input from the Commissioner through the release of his promised policy study on this precise issue.

III.

In rejecting the inmates' request for traditional foods at their annual powwow, the district court took a different tack.  It held that the prison's actions were not subject to scrutiny under

RLUIPA at all because they did not impose a "substantial burden" on the inmates' "religious exercise." *Haight*, 2013 WL 1092969, at *13. At this stage of the case, we must disagree.

The Act defines "religious exercise" broadly as "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A) (emphasis added). A powwow is indisputably a religious ceremony for members of this Native American Church, and, so far as this record shows, the inmates sincerely believe that a meal accompanied by corn pemmican and buffalo meat is part of that ceremony. In this instance and on this record, it is strange to think of this debate in terms of the prison burdening, substantially or otherwise, this aspect of the inmates' ceremonial requests. For the prison *barred* access to the foods altogether. The greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice).

Nor does it make a difference that prison officials allowed the inmates to have some traditional foods (fry bread) but not others (buffalo meat and corn pemmican) at the ceremony. When prison officials "place[] substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Hayes v. Tennessee*, 424 F. App'x 546, 555 (6th Cir. 2011) (internal quotation marks omitted), or "effectively bar" his sincere faith-based conduct, *Living Water Church of God v. Charter Twp. of Merdian*, 258 F. App'x 729, 739 (6th Cir. 2007), they necessarily place a substantial burden on it. The prison's decision to bar corn pemmican and buffalo meat "effectively bars" the inmates from this religious practice and forces them to "modify [their] behavior" by performing less-than-complete powwows with less-than-complete meals.

One of our decisions illustrates the point. In *DiLaura v. Township of Ann Arbor*, 112 F. App'x 445, 446 (6th Cir. 2004) (per curiam), we considered a challenge to a city's refusal to grant a zoning variance to a church that wanted to operate a facility for "contemplative prayer." The city's decision meant that the church could not serve alcohol, "thereby restricting [the church's] ability to provide communion wine" to its guests. *Id.* Because this decision "effectively barred [the church] from using the property in the exercise of [its] religion," we held that the decision imposed "a substantial burden on that exercise" under RLUIPA. *Id.*

So too here. In the aftermath of the prison's decision, the inmates still could perform meal-free powwows at the Kentucky State Penitentiary, just as the *DiLaura* church still could perform communion-free prayer services. Or, more specifically, the inmates still could perform powwows without buffalo meat and corn pemmican in the same way the *DiLaura* church still could offer grape juice at a prayer service. But in both instances the governmental actions still imposed a substantial burden on the religious practices of the individuals.

The prison officials respond that, if failing to give Native American inmates corn pemmican and buffalo meat for an annual powwow amounts to a RLUIPA-triggering "substantial burden" on their religious beliefs, what's next? Will not prison officials, already faced with vexing security challenges, "be held hostage to every inmate's outlandish religious requests," including everything from requests for "Papa John's pizza" to "Jacuzzi[s]" to "daily conjugal visits" and all sorts of things in between? Appellee Br. at 33–34. The point is a fair one. But there are at least three other ways to handle inmate demands gone wild.

*First*, nothing in RLUIPA bars a prison from "question[ing] whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic." *Cutter*, 544 U.S. at 725 n.13; *see Koger v. Bryan*, 523 F.3d 789, 797 (7th Cir. 2008). Just as a "substantial burden" on a religious practice is a threshold requirement under RLUIPA, so a sincerely held religious belief is a threshold requirement under the law. *See Koger*, 523 F.3d at 797. To the extent the prison officials think that the three inmates are faking it when it comes to their Native American religious beliefs or making it up when it comes to their belief that these food items are imperatives for a powwow, they should feel free to challenge that sincerity. With a properly developed record (including testimony from the inmates, reference to religious texts, etc.), they may ask the courts to filter out insincere requests. But we have no such record here—indeed no claim at all by the prison officials that the inmates are playing games—and thus no basis for deciding the "threshold [fact] question of sincerity." *United States v. Seeger*, 380 U.S. 163, 185 (1965).

*Second*, the existence of a "substantial burden" on a religious practice, even if stemming from a sincerely held belief, does not end the inquiry. The State still may show that its policy furthers a compelling governmental interest and does so in the least restrictive way. While strict

scrutiny may be a tough gauntlet for the State to run in most settings, that will not invariably be the case in a prison setting, especially a maximum-security prison setting, where the challenges of keeping inmates and guards safe and secure can perplex the most farsighted prison administrators. The Supreme Court has already said as much, acknowledging in another RLUIPA case that "prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." *Cutter*, 544 U.S. at 725 n.13. RLUIPA has been with us since 2000, and so far there is no evidence that the courts lack the tools, emphasized in *Cutter*, to distinguish legitimate from illegitimate requests under RLUIPA.

*Third*, RLUIPA, like RFRA before it, represents an effort to protect religious liberties by statute—and to do so in a serious way. *See* 42 U.S.C. § 2000cc-3(g) (noting that the law should be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution"). It should go without saying (though we will say it nonetheless) that one virtue of legislative protections, as opposed to constitutional ones, is that they can be modified more readily if they over-protect or under-protect a right. If straightforward enforcement of RLUIPA in State prisons (or for that matter RFRA in federal prisons) creates problems, we have no doubt that the States in general and prison wardens in particular will be heard if they request from Congress appropriate accommodations of their own.

The prison officials next try to open another front on this claim, submitting that the inmates' request falls outside the "rough outlines of reasonable religious expression" and that the inmates suffered only a "*de minim[i]s*" burden on their faith-based practices. Appellee Br. at 31, 33. The imposition of a "reasonable religious expression" stop sign on RLUIPA claims suffers from a series of factual and legal problems. Factually, what is unreasonable about this request? The inmates sought permission to buy two food items—at their own expense—for a once-a-year religious event. Legally, and more critically, neither RLUIPA nor for that matter the First Amendment permits governments or courts to inquire into the centrality to a faith of certain religious practices—dignifying some, disapproving others. RLUIPA protects a broad spectrum of sincerely held religious beliefs, including practices that non-adherents might consider unorthodox, unreasonable or not "central to" a recognized belief system. 42 U.S.C.

§ 2000cc-5(7)(A).  RLUIPA thus does not permit a prison warden to deny a Catholic inmate access to wine for a communion service on the ground that grape juice is a reasonable substitute or to deny grape juice to a Presbyterian inmate on the ground that water is a reasonable substitute.

In extending the free-exercise protections of the First Amendment beyond those recognized in *Smith* and other cases, RLUIPA did not cut back (even if it could) on a faith-sensitive consideration already baked into the constitutional cases.  Well before the passage of RFRA and RLUIPA, the Court acknowledged that the Constitution prohibited, and judges lacked the capacity to undertake, assessments of the centrality of faith-based practices to this or that religion.  "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith."  *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989); *see also Smith*, 494 U.S. at 887 ("[W]e have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."); *United States v. Lee*, 455 U.S. 252, 263 n.2 (Stevens, J., concurring) (noting the "overriding interest in keeping the government . . . out of the business of evaluating the relative merits of differing religious claims").

The prison officials add that they could not have substantially burdened the inmates' religious exercise, because they relied on a federal prison manual—the *Inmate Religious Beliefs and Practices* manual published by the Federal Bureau of Prisons—when they made their decision.  Yet the manual is not a compass that points one way and not another in explaining the role of these foods in the religious ceremony.  It is equivocal.  Pointing in one direction, the manual shows that the inmates' request is not contrived because it acknowledges that "[a] feast of traditional, familiar food (such as fry bread, corn pemmican, and buffalo meat) is seen as central to the [powwow]."  R. 46 at 45.  Pointing in the other, the manual suggests that corn pemmican and buffalo meat may not be required at all powwows—so long as the prison provides foods "such as" these.  *See id.*

Be that as it may, the broader point—the one critical here—is that courts may not reject RLUIPA claims based on government manuals alone.  The prison is free to test the sincerity of an inmate's religious beliefs or to show that the least restrictive means of satisfying a compelling

government interest permits it to regulate a faith-based practice. But it may not use a manual written by government officials to allow other government officials to decide on that basis alone that a practice is not central to this or that faith. As part of a sincerity inquiry, such a manual, along with other evidence, might suggest that the inmate's request lacks authenticity. Although "sincerity rather than orthodoxy is the touchstone, a prison still is entitled to give *some* consideration to an organization's tenets. For the more a person's professed beliefs differ from the orthodox beliefs of his faith, the less likely they are to be sincerely held." *Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011). The substantial-burden question turns on the impact of a government regulation on the individual *inmate*, not the centrality of those beliefs to canonical texts as interpreted by judges or prison officials. *See Cutter*, 544 U.S. at 725 n.13; *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004) ("[N]o test for the presence of a 'substantial burden' . . . may require that the religious exercise that is claimed to be thus burdened be central to the adherent's religious belief system."). This claim too, then, must be remanded for further development to account for these considerations.

## IV.

That leaves the money-damages claim. Recall that the remaining two inmates (Randy Haight and Greg Wilson) filed their lawsuit on the ground that the prison improperly denied them access to clergy visits. The district court did not reach the merits of the claim, holding that the prison mooted the request for injunctive relief by altering its policy and holding that RLUIPA does not provide money-damages relief. At stake at this point is only whether RLUIPA permits money-damages claims. We agree with the district court that it does not.

The statute allows inmates to seek "appropriate relief" from a "government" for RLUIPA violations. 42 U.S.C. § 2000cc-2(a). "[G]overnment" is defined as: "(i) a State, county, municipality, or other governmental entity created under authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law." *Id.* § 2000cc-5(4)(A).

*Sossamon v. Texas*, 131 S. Ct. 1651, 1655 (2011), rejected a similar claim and goes a long way to rejecting this one. It addressed whether the same phrase ("appropriate relief") in the same statute (RLUIPA) encompassed the same form of relief (money damages) in actions

against the same types of state employees (prison officials) when sued in their official capacity. In denying the request for money damages, the Court made two essential points. The first was that Congress must speak with clarity—"clearly," "expressly," "unequivocally," "unambiguously," *see id.* at 1657–62—before it imposes money-damages remedies against the States under its spending powers, *see id.* at 1661. The second was that the phrase "appropriate relief" does not clearly create a money-damages action because the language plausibly covers just injunctive, declaratory and other non-monetary relief. In the Court's words, "appropriate relief" is "open-ended and ambiguous about what types of relief it includes." *Id.* at 1659. "Far from clearly identifying money damages," the Court concluded, "the word 'appropriate' is inherently context-dependent" and thus does not apply to money-damages claims. *Id.*

In the face of *Sossamon*, the inmates make a thought-provoking, but in the end unconvincing, argument. For all of the similarities between this case and that one, they note, one thing is missing: *Sossamon* considered lawsuits against prison officials in their official capacity, not a claim against the prison officials in their individual capacity. Because lawsuits against state officials in their official capacity amount to lawsuits against the State for purposes of Eleventh Amendment (and other constitutional) immunities, and because lawsuits against state officials in their individual capacity do not, they insist that the clear-statement rule does not apply to this claim for monetary relief. Put another way, even if *Sossamon* establishes that the phrase "appropriate relief" fails to satisfy the clear-statement rule, it does not establish that the clear-statement rule applies to this claim for relief.

In making this argument, the inmates understate the coverage of the clear-statement rule. Clarity is demanded *whenever* Congress legislates through the spending power, whether related to waivers of sovereign immunity or not. *See South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). One of the distinguishing features of the spending power is that it allows Congress to exceed its otherwise limited and enumerated powers by regulating in areas that the vertical structural protections of the Constitution would not otherwise permit. *See NFIB v. Sebelius*, 132 S. Ct. 2566, 2602 (2012) (opinion of Roberts, C.J.); *id.* at 2659 (joint opinion of Scalia, Kennedy, Thomas and Alito, J.J.). So long as States consent to the bargain—receiving federal funds in return for allowing Congress

to regulate where it otherwise could not—the Constitution permits the arrangement. This feature of the spending power requires clarity throughout, not just in money-damages actions against state officials sued in their official capacity. That is why the Court's spending power cases refer in general to Congress "attach[ing] conditions on the receipt of federal funds," *Dole*, 483 U.S. at 206–07; *see* 42 U.S.C. § 2000cc-1(b)(1), and "require[]" in general that, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . . , enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation,'" *Dole*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17).

The rule is not limited to money-damages waivers, a reality confirmed by *Dole* itself, which required clarity when the Federal Government asked the States to set a minimum drinking age of 21 in return for federal highway funds. Pointing in the same direction is *Arlington Central School District Board of Education v. Murphy,* 548 U.S. 291 (2006). There, the Court applied the clear-statement rule to the question whether the term "costs" in the Individuals with Disabilities Education Act, also a spending-power law, covers expert-witness fees. And there, the Court did so even though the defendant was a school district, not a State. 548 U.S. 291, 295–96 (2006). Because the imperative of clarity applies in all of these settings and because *Sossamon* establishes that the phrase "appropriate relief" does not clearly entitle a claimant to money damages, the claimants' request for money damages must fail.

In the alternative, the inmates point out, Congress also invoked its Commerce Clause powers in enacting RLUIPA, claiming that this additional source of authority offers a way around the Spending Clause clear-statement rule. But when Congress invokes more than one source of federal power to enact a law, it does so as a form of insurance—on the off chance that the first source of authority exceeds its grasp. It does not invoke two sources of authority in order to permit two interpretations of the same phrase. Otherwise, the general presumption that language in a statute means the same thing in all settings would be an exception, not a rule. *See Clark v. Martinez*, 543 U.S. 371, 380 (2005). Where possible, and it is eminently possible here, courts avoid treating statutes like chameleons that turn green in some settings but not others. *See id.* at 382; *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2768–69 (2014)

(refusing to interpret the word "person" in the Religious Freedom Restoration Act to have different meanings in different contexts).

A comparable clear-statement rule at any rate applies to the federal regulation of state prisons under the commerce power. "If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so *unmistakably clear* in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (emphasis added and internal quotation marks and alterations omitted); *see also Bond v. United States*, 134 S. Ct. 2077, 2088–90 (2014). RLUIPA regulates state prisons, as traditional a state function as there is, making it appropriate to require Congress to "make its intention[s] . . . unmistakably clear" in the statute. Just as the phrase "appropriate relief" does not satisfy the one imperative of clarity, it does not satisfy the other.

The clear-statement rule also brushes aside the inmates' arguments under the Necessary and Proper Clause. That clause authorizes Congress to "make all Laws which shall be necessary and proper for carrying into Execution" its enumerated powers, U.S. Const. Art. I, § 8, cl. 18, and Congress has used this lever to impose criminal liability on individuals who pay bribes to federally funded organizations, *see Sabri v. United States*, 541 U.S. 600, 605 (2004). The inmates submit that this case is just like *Sabri*: There, Congress could impose liability on individuals under that spending power legislation; here, it should be able to do the same. But RLUIPA is nothing like the *Sabri* statute. The law in *Sabri* unambiguously extended criminal liability to government officials who accept bribes and to individuals who give them. *See* 18 U.S.C. § 666(a). Congress's failure to speak so clearly here renders any putative individual-capacity, money-damages condition in RLUIPA *in*appropriate.

*Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), and *Barnes v. Gorman*, 536 U.S. 181 (2002), do not advance the inmates' claim. *Sossamon* rejected a look-alike argument, and that rejection controls us here. 131 S. Ct. at 1660.

We have considerable company in reaching this conclusion. Every circuit to consider the question, whether before *Sossamon* or after, has held that RLUIPA does not permit money damages against state prison officials, even when the lawsuit targets the defendants in their individual capacities. *See Washington v. Gonyea*, 731 F.3d 143, 145–46 (2d Cir. 2013); *Stewart*

*v. Beach*, 701 F.3d 1322, 1334–35 (10th Cir. 2012); *Sharp v. Johnson*, 669 F.3d 144, 153 (3d Cir. 2012); *Nelson v. Miller*, 570 F.3d 868, 886–89 (7th Cir. 2009); *Rendelman v. Rouse*, 569 F.3d 182, 186–89 (4th Cir. 2009); *Sossamon v. Texas*, 560 F.3d 316, 327–29 (5th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1271–75 (11th Cir. 2007).

Some of these cases, it is true, chart a different path.  Some hold that because spending-power legislation is in the nature of a contract and because the State, not the defendant prison officials, receives money under the federal legislation, it would be inappropriate to impose a money-damages remedy on local prison officials.  *See, e.g.*, *Stewart*, 701 F.3d at 1334–35; *Nelson*, 570 F.3d at 887–89.  With respect, this approach proves too much.  If accepted, it would mean that even an eminently clear statute—say, that "plaintiffs could obtain money damages in actions against state and local prison officials, whether sued in their official or individual capacity"—would not permit money damages.  That is not consistent with *Dole* or *Arlington Central* or *Pennhurst* itself.

## V.

For these reasons, we affirm in part, vacate in part and remand for further proceedings.

---

**CONCURRENCE**

---

COLE, Chief Judge, concurring.  Although I agree that the plaintiffs cannot recover from the prison officials in their individual capacities, I respectfully depart from the majority's analysis.  I do so for two reasons: first, to explain why *Sossamon v. Texas*, 131 S. Ct. 1651 (2011), does not resolve the money-damages claim, and second, to express my view that we do not need to reach the plaintiffs' argument that RLUIPA's Commerce Clause basis authorizes money damages.

There can be no question that *Sossamon* was decided on narrow grounds specific to the legal framework at issue in that case—namely, sovereign immunity.  Indeed, the Court noted that "the word 'appropriate' is inherently context-dependent," and then went on to conclude that "[t]he context here—*where the defendant is a sovereign*—suggests . . . that monetary damages are not 'suitable' or 'proper.'"  131 S. Ct. at 1659 (emphasis added).  *Sossamon* does not establish that RLUIPA's provision for "appropriate relief" categorically excludes monetary damages.  It establishes only that the term "does not so clearly and unambiguously waive sovereign immunity to private suits for damages that we can be certain that the State in fact consents to such a suit."  *Id.* at 1658–59 (internal quotation marks omitted).

The majority's reliance on *Sossamon* has the virtue of simplicity, but it ignores the fact that courts operate under different presumptions when encountering a request for monetary relief from a state, as opposed to a request for monetary relief from an officer sued in his or her individual capacity.  When a plaintiff sues the state, we presume that money damages are unavailable, unless the state has consented to an express waiver of its immunity.  *See, e.g.,* *Blatchford v. Native Vill. of Noatak and Circle Vill.*, 501 U.S. 775, 779 (1991).  In contrast, we regularly grant monetary relief to plaintiffs who successfully sue officers in their personal capacities.  *See, e.g.,* *Smith v. City of Chi.*, 820 F.2d 916, 918 (7th Cir. 1987) (noting that "[s]uits under § 1983 typically seek money damages").  It is therefore fair to assume that a provision for "appropriate relief" would not authorize money damages from the state absent the state's waiver,

but would authorize them from personal-capacity defendants absent some other legal principle limiting the scope of the term "appropriate."

That other legal principle can be found in *Arlington Central*—a case that should be central to our Spending Clause analysis. There, the Court extended *Pennhurst*'s clear-statement principle to apply not only to the *conditions* a Spending Clause enactment places on participating states, but also to the *remedies* the enactment makes available when a state fails to comply. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *id.* at 317 (Breyer, J., dissenting) (both citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981)). Thus, the Court concluded that a provision allowing plaintiffs to collect "reasonable attorneys' fees as part of the costs" of bringing suit did not encompass expert fees because the statute had failed to put the states on notice that they could be liable for this expense. *Id.* at 296–97 (quoting 20 U.S.C. § 1415(i)(3)(B)).

*Arlington Central* controls here and requires that RLUIPA "furnish[] clear notice regarding the liability at issue." *Id.* at 296. In my view, RLUIPA's provision for "appropriate relief" does not "unambiguously authorize" prisoners to recover money damages from prison officials.[1] *Id.* at 303. I therefore agree with my colleagues that the relief the plaintiffs seek is not available.

---

[1]*Arlington Central* indicates that we may look to sources of meaning other than the statute's plain text to shed light on the ambiguous term in question. *Id.* at 296–303. The plaintiffs here make two main arguments that RLUIPA authorizes monetary relief. First, they note that, in *Barnes v. Gorman*, 536 U.S. 181, 187 (2002), and *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 66, 76 (1992), the Supreme Court determined that "appropriate" remedies include compensatory damages when the type of relief available under a statute is uncertain. But because these cases pre-date *Arlington Central* and its extension of the clear-statement rule in the Spending Clause context, they cannot so easily resolve the question here.

Next, the plaintiffs point out that RLUIPA defines "government" as including "any . . . person acting under color of State law." 42 U.S.C. § 2000cc-5(4)(A)(iii). This language, they argue, echoes § 1983 and therefore points to the availability of money damages. However, the phrase "person acting under color of State law" or its equivalent is used in numerous sections of the United States Code, many having nothing to do with the availability of money damages. *See, e.g.*, 18 U.S.C. § 2511(2)(c) & (d) (regarding interception of wire and electronic communications); 28 U.S.C. § 1365(a) (granting jurisdiction for actions brought by Senate to enforce subpoenas or other orders); 28 U.S.C. § 1443 (authorizing removal to federal court of civil-rights actions). Additionally, contrary to the plaintiffs' assertions, this language is not necessarily superfluous if we decline to accept their interpretation. For example, the phrase "acting under color of State law" provides guidance as to which prison officials a prisoner can sue. *See, e.g.*, *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 919, 927 (9th Cir. 2011) (holding that prison's "contract chaplains" are not state actors for purposes of RLUIPA).

As the majority explains, the plaintiffs also argue that Congress could have authorized money damages from personal-capacity defendants under its commerce power. I do not find it necessary to address this argument, however, because the plaintiffs did not invoke interstate commerce as a basis for their claims in district court, and the district court never considered this issue. *See Washington v. Gonyea*, 731 F.3d 143, 146 (2d Cir. 2013) (declining to consider "whether RLUIPA authorizes individual-capacity suits under the imprimatur of the commerce clause" where plaintiff "pled no facts" pertaining to interstate commerce); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (same, where plaintiff "has claimed RLUIPA jurisdiction exclusively under" the statute's Spending Clause provision). Moreover, RLUIPA's Commerce Clause basis implicates constitutional issues of the sort that courts avoid considering unless necessary. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445–46 (1988).

My colleagues take a different approach. In only a few words, they swiftly conclude that a clear-statement rule applies to the *remedies* available under a Commerce Clause enactment, effectively extending *Arlington Central* to the interstate-commerce context. The Supreme Court does not require them to do so. Our court does not require them to do so. And I wonder how the "usual constitutional balance between the States and the Federal Government," Maj. Op. at 18, would be upset by a request for monetary relief against an official in his or her personal capacity.

Unlike my colleagues, I see no reason to extend a clear-statement rule to a context in which it does not clearly apply. Furthermore, I believe that the constitutional avoidance doctrine counsels us against doing so. Although the clear-statement principle has been characterized as a "rule of statutory interpretation," *see, e.g.*, *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 284 (6th Cir. 2009) (en banc) (Sutton, J., concurring), in effect it operates much like substantive constitutional doctrine by directing how courts should weigh the Constitution's competing values and interests. *See* John F. Manning, *Clear Statement Rules and the Constitution*, 110 Colum. L. Rev. 399, 445, 449 (2010) (concluding that "[m]odern clear statement rules attempt to make constitutional law on the cheap" when they "transform a multifaceted constitutional doctrine into a streamlined one-dimensional constitutional value[,] such as federalism"); William N. Eskridge. Jr. & Philip P. Frickey, *Quasi-Constitutional Law: Clear Statement Rules as Constitutional Lawmaking*, 45 Vand. L. Rev. 593, 611–12 (1992)

(arguing that the clear-statement principle "has replaced constitutional law" as the Court's means for enforcing federalism). In my view, then, extending a clear-statement rule to a new context is akin to adopting a new principle of constitutional law. I would reserve any discussion of RLUIPA's Commerce Clause basis for a case that squarely presents that issue to us.