RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0255p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GERALD BYRD,

> *Plaintiff-Appellant*,

*v.*

RANDALL HAAS, Warden, et al.,

> *Defendants-Appellees*.

No. 20-2286

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:17-cv-11427—Stephen J. Murphy, III, District Judge.

Argued:  October 19, 2021

Decided and Filed:  November 9, 2021

Before:  GILMAN, THAPAR, and NALBANDIAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Jeffrey A. Crapko, MILLER, CANFIELD, PADDOCK AND STONE, PLC, Detroit, Michigan, for Appellant.  Jennifer A. Foster, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.  **ON BRIEF:**  Jeffrey A. Crapko, Amanda Rauh-Bieri, MILLER, CANFIELD, PADDOCK AND STONE, PLC, Detroit, Michigan, for Appellant.  Jennifer A. Foster, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

_____

## OPINION

_____

THAPAR, Circuit Judge.  Six years ago, Robert Byrd requested that the Michigan Department of Corrections allow him to worship with other members of his Ifa faith and to

obtain certain religious property fundamental to that faith.  But to this day, many of his requests remain unanswered.  Since such a long delay is tantamount to a denial, we reverse and remand.

I.

We divide this section into three parts.  First, we outline the Department's policy.  Then we trace Byrd's journey, taking the evidence in the light most favorable to Byrd.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And last, we describe the case's procedural history.

A.

Both parties agree the Department's policy lays out the framework that governs an inmate's religious requests.  That policy recognizes "[r]eligious freedom is a constitutionally guaranteed right" that prisoners may enjoy "within the constraints necessary for the safety, security, and good order of the facility."  R. 80-2, Pg. ID 758.  Inmates may hold formal group services or possess certain religious property only if the Department has formally recognized their faith.  Buddhists, for example, may own one strand of meditation beads and a single picture of the Buddha.  Muslims meanwhile are allowed a prayer rug, a strand of dhikr beads, a star-and-crescent pendant that may be worn as a necklace, and either a kufi cap or a hijab.  Ifa adherents may keep a set of sixteen cowry shells, one strand of white consecrated beads, and one picture of the Orisha, a group of important deities in the faith.[1]  Though the Department recognizes the Ifa faith, it is one of only three recognized religions that was denied group services.  The record doesn't tell us why.  But the policy tells us a group is not guaranteed religious services if there are "less than five prisoners within the same security level" in a facility.[2]  *Id.* at 761.  And the Department adds that it may bar group services if they may pose "safety and security" concerns.  Appellees' Br. 6 (citing R. 80-2, Pg. ID 761).

---

[1]Both the Defendants' briefing and Department policy documents repeatedly refer to the Ifa faith as "Yoruba."  Byrd, however, believes this is incorrect because Yoruba is a region in western Africa, and Ifa should not be considered "coextensive with Yoruban culture," though "many [Yoruban people] practice Ifa."  Appellant's Br. 3 n.1.  For that reason, we also refer to Byrd's faith as Ifa.

[2]Byrd's counsel notes that there were at least five Ifa prisoners at Byrd's current facility as of March 12, 2019.  R. 87-21, Pg. ID 2284.

The parties also agree that the policy offers a straightforward path for inmates to request group-worship rights and religious property. The inmate's role is minimal. He need only submit a request "in writing to the Warden or designee and include a description of the religious item along with an explanation of its significance" to his faith. R. 80-2 at 763. As the Department concedes, once the prisoner submits this request, there is "no further role for the prisoner to play." R. 87-9, Pg. ID 1763. The duty then shifts to the warden (here, Randall Haas) or his designee to "forward the request and any supporting documents to the [] Special Activities Coordinator through the appropriate chain of command." R. 80-2, Pg. ID 763. And this duty is a mandatory one. The warden has no "discretion over whether or not to forward" Byrd's request to the special activities coordinator. R. 87-9, Pg. ID 1762.

The policy likewise circumscribes the special activities coordinator's role. Upon receiving the request, the special activities coordinator (here, David Leach) must study it before making a recommendation to the Department's deputy director. As part of this review, the special activities coordinator typically forwards the request to the Chaplaincy Advisory Council, a volunteer group of local religious leaders who help him assess religious claims. Both the council and the special activities coordinator are tasked with evaluating whether an inmate's requested religious property "is necessary to the practice of [the prisoner's] religion." R. 87-11, Pg. ID 2030–36. They then file separate recommendations with the deputy director (here, Kenneth McKee).

The deputy director must make the final decision. Besides considering the council's and special activities coordinator's recommendations, he must also determine whether the requested religious item "poses a threat to the custody and security of the facility." R. 87-18, Pg. ID 2218. If an inmate's request survives both hurdles, then the deputy director must approve it.

B.

As far as bureaucracy goes, the policy seems simple. Discretion is minimal and requests appear straightforward. But Byrd's story paints a different picture. Between his conversion to the Ifa faith in August 2015 and filing this lawsuit more than two years later, Byrd sent four requests for Ifa group services and nine items that he considers essential to the Ifa faith. These

items include, among other things, a straw mat for prayer, herbs, and more beads. How did the Department respond to these requests? It didn't. Not one made its way to McKee for a final decision. And since this lawsuit began, Byrd has filed a fifth request. But the Department hasn't fully resolved that request either.

*First Request*: While housed in the Saginaw Correctional Facility, Byrd sent his first request in September 2015 to both Leach and his warden. Leach responded three months later, telling Byrd that he must first send his request to the warden. But the Saginaw warden never responded to Byrd's request or forwarded the letter to Leach.

*Second Request*: Now at Macomb Correctional Facility, Byrd tried again. He sent his second request in February 2016 to Haas, his new warden, along with Leach and McKee. For good measure, Byrd attached a letter explaining that he had "sent one copy to [his] last facility's warden . . . and received no response so a response would be greatly appreciated." R. 87-15, Pg. ID 2162. He also copied each official listed under the policy to ensure that they all knew the letter had reached Haas. Time stamps show that Haas received the letter no later than the end of March 2016. In fact, Haas sent the request to the prison's chaplain for advice. But he never forwarded the request to Leach. Why? He didn't "recall receiving this document." R. 87-9, Pg. ID 1797.

*Third Request*: After another month without a response from the defendants, Byrd sent letters to both Leach and McKee. Byrd reminded Leach that he had submitted the same request twice before to no avail despite making "every possible attempt to comply with [the policy]." R. 87-22, Pg. ID 2291. He stressed once more that both group services and his requested religious property are "necessary for the practice" of the Ifa faith, and that the Department was violating the Constitution when it denied his requests while "similarly situated" prisoners were allowed comparable privileges. *Id.* He closed by expressing his "sincere[] hope" that "this may be resolved without" litigation. *Id.* Neither Leach nor McKee responded.

But Leach did ask Chaplain Leroy White if he knew anything about Byrd's request. In response, White interviewed Byrd in mid-May and then photocopied Byrd's request. The chaplain notified Leach that Byrd was still asking for personal religious items and group

services.  R. 87-10, Pg. ID 1891.  Thus, by May—almost nine months after Byrd's first request—Leach not only knew about the requests, but also knew that Byrd had fully complied with the policy.  Yet he still did not submit Byrd's request to either the council or McKee.  Nor did he ask Haas about Byrd's claims.

*Fourth Request*:  Two more months passed without a response.  So Byrd wrote a follow-up letter to Haas in July 2016 seeking a status update.  Haas again failed to respond to Byrd or forward the request to Leach.  Instead, he let the request sit after writing a note to discuss it with White.

*Fifth Request*:  After litigation began, Byrd sent yet another request to his warden in July 2019.  And earlier this year—almost six years after Byrd's first request—the acting special activities coordinator notified Byrd that the Ifa faith would now be approved for group religious services.  He also stated that Byrd's request for religious articles "will be sent back to the [council] for recommendations on services and religious property."  Reply Br. 3 n.1.  And yet, according to Byrd, "[t]he policy has not been amended and group services are still not allowed." *Id.*  On remand, the district court can monitor the state of Byrd's fifth request and determine whether these developments moot Byrd's request for injunctive relief.

## C.

After almost two years of having his religious-liberty claims ignored, Byrd sued various Department officials for alleged violations of his statutory and constitutional rights.  More precisely, Byrd contends that Haas, Leach, and McKee have violated his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), the Free Exercise Clause, and the Equal Protection Clause.  Byrd also alleges that Haas violated his Fourteenth Amendment procedural-due-process rights.

The district court granted the defendants' motion for summary judgment, finding qualified immunity for the officials on Byrd's constitutional claims.  It also ruled that Byrd's RLUIPA claims against Haas and Leach were moot because they have retired since Byrd filed suit, and granted summary judgment for McKee on Byrd's remaining RLUIPA claim.

## II.

In this case, framing is everything.  Byrd alleges that the defendants have "restrict[ed]" him "from freely practicing his religion by refusing to approve group religious services and personal religious property."  R. 24, Pg. ID 92.  As he puts it, his complaint "is not—and has never been—just about the Defendants' failure to forward his request."  Reply Br. 6 n.3.  Instead, Byrd characterizes this case as about the Department's "outright refusal to even consider a legitimate request for religious accommodation, the *de facto* perpetual denial of which left Byrd unable to practice his religion."  *Id.*

The defendants, unsurprisingly, see things differently.  They seek to downplay Byrd's multi-year saga as a minor breakdown of protocol.  In their eyes, "Byrd's allegations all stem from an alleged failure to act," and "generally a failure to act does not rise to the level of a constitutional violation."  Appellees' Br. 14.  In the same vein, they note that Byrd's "narrow complaint" takes aim only at individuals' actions rather than Department policy or an agency action.[3]  *Id.*

So was the defendants' failure to respond to Byrd's religious requests a mere bureaucratic oversight?  Or did it deprive him of his constitutionally and statutorily protected rights of worship?

The district court accepted the Department's framing.  That is, the court framed the issue as one of process: "Do prison officials violate inmates' Free Exercise rights when they do not approve group religious services or expansions of personal religious property through an appropriate process?"  R. 109, Pg. ID 3061.  And once the issue was framed, the case became an easy one.  In granting Haas summary judgment on Byrd's free-exercise claim, for instance, the court found that Haas's failure to forward the letter was little more than "either an isolated incident or the result of confusion or miscommunication."  *Id.* at 3062.  To reach this conclusion,

---

[3]The defendants argue that because Byrd complained only of individual employees' actions, those claims became moot when Haas and Leach retired.  Not so.  Byrd's pro se complaint sued the defendants in their official capacities.  And in official-capacity suits, under Federal Rule of Civil Procedure 25(d), an action does not become moot when an official resigns or retires.  Instead, his or her successor is automatically substituted as the party.  Fed. R. Civ. P. 25(d).

the district court pointed out that "Haas was not the decisionmaker with authority to grant or deny Byrd's ultimate request." *Id.* Likewise, the district court granted summary judgment for Leach after holding that Byrd "did not have a clearly established right" to have Leach "reply to or forward [his] request for Ifa group religious services and particular religious property." R. 63, Pg. ID 628. And the district court also granted McKee—the final decisionmaker—qualified immunity. Here, the court determined that McKee did not have a duty to act until Byrd's request "reached him through the chain of command—an event that never occurred." R. 109, Pg. ID 3070. All these rulings hinge on the district court's decision to frame this case as a procedural failure rather than a constructive denial.

But that framing is wrong. Under the Department's theory of the case, prison officials can effectively block an inmate from religious exercise by breaking up the approval process. Consider a brief hypothetical. Suppose that the Department knows that under RLUIPA it would likely have to grant a request from Jewish inmates to hold Yom Kippur services. But let's say the Department wants to bar them from doing so. By the Department's lights, the officers could simply sit on the request, claiming their failure to forward it to the final decisionmaker was a procedural mishap. But a government agency cannot simply end-run judicial review by sitting on its hands and allowing a claimant's request to languish in a bureaucratic black hole.

Our own caselaw recognizes this. In *Haight v. Thompson*, a group of Native American inmates requested access to a sweat lodge through their prison's designated process. 763 F.3d 554, 560 (6th Cir. 2014). But the Kentucky Department of Corrections dragged its feet. Though more than four years had passed, the commissioner of the department had not yet issued a final statewide report on the matter. *Id.* Did that mean the inmates had failed to exhaust their administrative remedies when they asked us to step in? Of course not. We held that "[a]dministrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance." *Id.* at 561 (quoting *Boyd v. Corr. Corp. of Am.*, 380 F.3d 989, 996 (6th Cir. 2004)).

Here, the same is true. Byrd took every conceivable action to pursue his claim. He had nowhere else to turn. Only the prison officials failed to bring it to fruition. Indeed, the

defendants left him in the dark; no official told him at any point until after briefing had begun here that his request would be reviewed.

And in practical terms, this multi-year failure amounted to an outright denial of Byrd's requests.[4]  From Byrd's perspective, there was no material difference between the Department never processing his request and denying it.  *Cf. Env't Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970) ("[W]hen administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief.").  In either case, Byrd cannot worship with other Ifa adherents.  Nor can he pray with objects critical to his faith.

We have recognized constructive denials of this sort in other contexts.  In *Overlook Mutual Homes, Inc. v. Spencer*, for example, we noted that a housing provider's "unreasonabl[e] delays responding to a request for an accommodation . . . may amount to a denial."  415 F. App'x 617, 622 (6th Cir. 2011).  Consider also *Americans United for Separation of Church & State v. City of Grand Rapids*, 922 F.2d 303 (6th Cir. 1990).  There, a Jewish group, Chabad, moved to intervene in a case challenging Grand Rapids's practice permitting the group to erect a menorah on public property during the holiday of Hanukkah.  *Id.* at 305.  When the district court scheduled its hearing on the motion for after the holiday, we held that "such a delay is the practical equivalent of a denial of Chabad's application."  *Id.* at 306.  The same can be said here.

To be sure, constructive denials are—and should remain—rare.  Only in an unusual case such as ours should we recognize one.  And when determining whether a constructive denial has occurred, courts should take context as their guidepost.  *Cf. Barrios Garcia v. U.S. Dep't of Homeland Sec.*, 14 F.4th 462, 485 (6th Cir. 2021) ("A claim of unreasonable delay is necessarily fact dependent." (citation omitted)); *see also Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003) ("Resolution of a claim of unreasonable delay is

---

[4]The exact length of the delay turns on the claim.  When assessing the officers' qualified-immunity defense, the district court should consider the delay from the time of Byrd's first request in September 2015 to the day he filed his complaint.  But when assessing his claims for injunctive relief, the district court should consider his delay still ongoing.

ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court."). This may include considering the length of the delay, any reasonable justification for the delay, and the nature of the interest involved.

Each of these considerations militates in Byrd's favor. Here, various department officials—Haas, Leach, and White to name just a few—were aware of Byrd's requests. Yet the Department did not even begin analyzing the request for more than five years. Indeed, Byrd did not receive word that any process had begun until after briefing started in this case. And the defendants have offered no justification for this delay. That's especially troubling here because Byrd's request appears straightforward. Even though department officials were unfamiliar with the Ifa faith, much of what Byrd is asking for resembles requests that the Department has granted for other religious groups.

The best that the defendants offer is that "[n]othing surrounding new religious requests happens quickly." Appellees' Br. 23. That may be true. But it took almost six years for the Department to respond directly and substantively to Byrd. Nothing in the record excuses this inactivity. And in the meantime, Byrd has been deprived of religious property and group services—both of which he believes are necessary for his faith. As a result, we hold that the Department's extreme delay constructively denied Byrd's requests. His RLUIPA and constitutional claims must therefore be analyzed through that lens.[5]

---

[5]Our circuit has held that litigants, like Byrd, cannot recover damages under RLUIPA. *See Haight*, 763 F.3d at 568. Thus, Byrd's claim for monetary relief is permitted only under the First Amendment. Under the Supreme Court's test, the district court must ask whether the Department's denial of Byrd's request furthers a valid penological interest. *Turner v. Safley*, 482 U.S. 78, 89–90 (1987). If the Department cannot make such a showing, Byrd prevails. *See Maye v. Klee*, 915 F.3d 1076, 1083–84 (6th Cir. 2019). If the Department can make this showing, however, the district judge must balance (1) whether Byrd possesses alternative avenues for exercising his religion; (2) how accommodating his request would affect "guards and other inmates" or "the allocation of prison resources generally"; and (3) whether "obvious, easy alternatives" exist that suggest "the regulation is not reasonable." *Turner*, 482 U.S. at 89–91. The district court must relatedly perform a qualified-immunity analysis for each of the officers if the *Turner* factors have been met.

Byrd also raises an Equal Protection Clause challenge. We reverse the district court's decision to dismiss the equal-protection claim and remand for further consideration. The court should consider whether defendants' constructive denial of Byrd's requests amounts to "a facially discriminatory distinction [that] would burden [Byrd's] fundamental rights to religious freedom under the First Amendment, which means an invidious purpose may be inferred." *Koger v. Mohr*, 964 F.3d 532, 545 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Maye v. Klee*, 915 F.3d 1076, 1086 (6th Cir. 2019)).

As we have laid out in earlier cases, RLUIPA operates as a "three-act play."  *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019).  At the first step, Byrd must show that his request stems from a "sincerely held religious belief." *Holt v. Hobbs*, 574 U.S. 352, 361 (2015).  Next, he must demonstrate that the Department "substantially burdened" his religious exercise when it effectively denied his request. *Id.*  Though the record contains enough for us to fill in the gaps for RLUIPA's "first act" and "second act," we do not know how this particular story will end.  That's because the burden shifts to the Department for the final step.  At this stage, the Department must prove that its denial of Byrd's request was the "least restrictive means of furthering [a] compelling governmental interest."  42 U.S.C. § 2000cc-1(a)(1)–(2).  During this step, courts must take prison officials' decisions about prison security seriously.  After all, prison officials, not courts, are the experts in how to run a prison. *See Holt*, 574 U.S. at 364.  Yet at the same time, we demand a tailored inquiry that turns on the individual inmate's case. *Haight*, 763 F.3d at 562–64. Thus, courts must "scrutinize the asserted harm" that the Department will incur if it grants a "specific exemption" to Byrd in particular. *Holt*, 574 U.S. at 363 (cleaned up).

The record is spartan on these issues.  On remand, the district court should "take additional evidence as necessary," knowing this is an exacting standard for the Department. *Fox v. Washington*, 949 F.3d 270, 283 (6th Cir. 2020).

### III.

For those who do not understand the Ifa faith, the deprivation of beads or a prayer mat may seem insignificant.  That, however, misses the entire point of our religious-liberty jurisprudence.  From our Founding, this Nation has made religious freedom a bedrock principle of our ordered liberty. *See, e.g.*, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1901 (2021) (Alito, J., concurring in judgment) (noting that "critical state ratifying conventions approved the Constitution on the understanding that it would be amended to" expressly protect rights including religious liberty).  Indeed, if anything, we must be especially solicitous of religious

---

Finally, Byrd claims that his procedural-due-process rights were violated because the Department never processed his request.  We leave this claim to the district court in the first instance by reversing and remanding for further consideration in light of the determination that the delay in responding to Byrd's requests amounts to a constructive denial.

claimants who run against fashionable trends. *Cf. Bible Believers v. Wayne County*, 805 F.3d 228, 243 (6th Cir. 2015) (en banc) (noting that it is "the minority view . . . that most often needs protection under the First Amendment"). Insulated from the rebukes of the electorate, it is our constitutional duty to protect the religious freedom of minority adherents as vigorously as anyone else's.

And if the "Constitution cannot be put away and forgotten" "even in a pandemic," *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam), then we certainly cannot allow it to slip through mere bureaucratic cracks. Thus, this case should be analyzed as a constructive denial of Byrd's request for group religious services and religious property. The defendants might still prevail on qualified immunity. But we are "a court of review, not of first view." *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005). So we reverse the judgment and remand for the district court to reconsider its analysis.