RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0136p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JAMES HARRISON FOX; SCOTT DAVID PERREAULT,

 *Plaintiffs-Appellants*,

 *v.*

No. 21-1694

HEIDI E. WASHINGTON, Director of the Michigan Department of Corrections (MDOC),

 *Defendant-Appellee*.

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:13-cv-01003—Phillip J. Green, Magistrate Judge.

Argued: April 5, 2023

Decided and Filed: June 26, 2023

Before: SUTTON, Chief Judge; GRIFFIN and STRANCH, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Breia Lassiter, MICHIGAN STATE UNIVERSITY, East Lansing, Michigan, for Appellants. Michael R. Dean, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Daniel E. Manville, MICHIGAN STATE UNIVERSITY, East Lansing, Michigan, for Appellants. Michael R. Dean, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.

Plaintiffs are adherents to Christian Identity, a religion that is "explicitly racist." *Fox v. Washington*, 949 F.3d 270, 273 (6th Cir. 2020). In its view, Caucasians are "God's chosen people." *Id.* at 274 (internal quotation marks omitted). After the Michigan Department of Corrections refused to recognize Christian Identity as a religion for purposes of the Michigan prison system, plaintiffs brought this declaratory judgment action under the Religious Land Use and Institutionalized Person Act of 2000, 42 U.S.C. § 2000cc *et seq.* (RLUIPA), requesting that the Department be directed to recognize Christian Identity as a religion. The district court affirmed the Department's denial, and plaintiffs appealed.

In *Fox*, we held that plaintiffs satisfied the first two parts of the three-part RLUIPA test, but we remanded to the district court for the Department to sustain its "heavy burden" under a strict scrutiny analysis to show that its refusal to recognize Christian Identity as a religion furthered a compelling governmental interest, and, if so, that its denial was the least restrictive means of furthering such a compelling interest. 949 F.3d at 283.

On remand, the district court concluded that the Department met its burden and that refusing to recognize Christian Identity was the least restrictive means to ensure its compelling governmental interest. We disagree and hold that the Department failed to satisfy its burden of showing that its denial of recognition was the least restrictive means of furthering a compelling governmental interest. Alternatives, other than to simply accept or reject recognition, were available and included in the Department's policies, but never considered by it.

Accordingly, we reverse the judgment of the district court and remand for entry of judgment in plaintiffs' favor.

I.

Following our previous decision, the district court held an evidentiary hearing during which the Department produced additional evidence regarding the potential security threat posed by Christian Identity. The Department's principal witness at the hearing was Todd Bechler, a "senior intelligence analyst with the emergency management section." Bechler testified that Christian Identity "tends to be more towards a white supremacist-type of ideological perspective." He acknowledged that the Christian Identity religion itself was not directly responsible for violence but noted that "there is significant evidence to suggest that the leaders of most [of] the significant white supremacist organizations are adherent to Christian Identity." He opined that Christian Identity should not be recognized by the Department "based solely on the separation of the racial component." In Bechler's view, recognizing Christian Identity as a religion would likely increase racial tensions in the Department's facilities. That was an important consideration because minimizing racial tensions reinforces facility security. According to Bechler, it was the Department's "position" that "Christian Identity is a racial[ly] motivated movement that possessed [sic] a threat to the overall security of our institution." Bechler also testified about "security threat groups," noting that, although entire groups could be labeled as a "security threat group," that designation normally attached to specific individuals. In theory, the entire Christian Identity group could be designated as a security threat group. No such designation was made here.

Plaintiffs also testified at the hearing. Both testified that Christian Identity advocated for nonviolence and that any violence based on racism conflicted with Christian Identity teachings. They also testified that they would permit non-Caucasians to attend Christian Identity services and advise them ahead of any service of the tenets of the Christian Identity religion. In addition, plaintiffs testified that, if an individual at a service acted aggressively toward another, they would ask the aggressor to leave.

The district court issued a written order concluding that the Department's recognition of Christian Identity as a religion would likely threaten the safety and security of the Department's facilities. In doing so, it held that the Department has a compelling interest in prison safety and that recognizing an "explicitly racist" religion like Christian Identity would likely increase the

risk of violence in the Department's facilities. Then, in a single paragraph, it found that not recognizing Christian Identity was the least restrictive means to further the Department's safety interest because "[f]ormal recognition of a faith group is a binary question." Significantly, the court did not address any alternatives to lessen the potential security threat posed by recognizing the religion. Accordingly, the district court again granted judgment in the Department's favor on plaintiffs' RLUIPA claim. This second appeal followed.

## II.

On appeal, we review the court's factual findings for clear error and its legal conclusions de novo. *Fox*, 949 F.3d at 276. "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (citation omitted). That said, we review de novo the question of whether a substantial burden on religious exercise "serves a compelling interest in the least restrictive means." *Ackerman v. Washington*, 16 F.4th 170, 180 (6th Cir. 2021).

## III.

We remanded this case for the Department to demonstrate that it had a "compelling governmental interest" in not recognizing Christian Identity as a religion and that it employed the "least restrictive means" in doing so. *Fox*, 949 F.3d at 282. The Department "face[d] a heavy burden" in this inquiry. *Id*. at 283. We agree with plaintiffs that the Department did not sustain its burden.

Under RLUIPA, "the government cannot discharge [its] burden by pointing to broadly formulated interests." *Ramirez v. Collier*, 142 S. Ct. 1264, 1278 (2022) (internal quotation marks omitted). "It must instead demonstrate that the compelling interest test is satisfied through application of the challenged law to the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* (internal quotation marks and brackets omitted); *see also id.* at 1281 ("RLUIPA, however, requires that courts take cases one at a time, considering only the particular claimant whose sincere exercise of religion is being substantially burdened.") (internal quotation marks omitted). This individualized inquiry also applies when an inmate seeks

permission to engage in group religious services.  *Byrd v. Haas*, 17 F.4th 692, 694, 699–700 (6ᵗʰ Cir. 2021); *see also Haight v. Thompson*, 763 F.3d 554, 563–64 (6th Cir. 2014) (applying the individualized-inquiry standard to a request for a sweat lodge that would be used for group services).  Moreover, speculation cannot carry the Department's burden because RLUIPA requires a case-by-case inquiry.  *Ramirez*, 142 S. Ct. at 1280.  Similarly, "[b]ecause the focus is on the interest in burdening the specific prisoner, the state's interest in merely avoiding other and additional accommodations—a slippery slope—is usually insufficient."  *Ackerman*, 16 F.4th at 187.

Crucially, the Department bears the burden of demonstrating there are no less restrictive means to ensure facility security than refusing to recognize Christian Identity.  *Ramirez*, 142 S. Ct. at 1281.  This is an "exceptionally demanding" standard—the government must "show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.  If a less restrictive means is available for the Government to achieve its goals, the Government must use it."  *Holt v. Hobbs*, 574 U.S. 352, 364–65 (2015) (internal quotation marks, alterations, and internal citations omitted).  Finally, "[c]ourts must hold prisons to their statutory burden, and they must not assume a plausible, less restrictive alternative would be ineffective."  *Id.* at 369 (internal quotation marks omitted).  "[I]n the absence of evidence demonstrating (as opposed to lawyer arguments speculating) that the prison considered and rejected alternatives more tailored to its security interest, the prison's prohibition cannot withstand [the least-restrictive-means] aspect of strict scrutiny."  *Haight*, 763 F.3d at 564.

The district court framed the Department's decision on whether to recognize Christian Identity as a binary choice:  recognize Christian Identity and allow group worship, or not.  Because, in its view, not recognizing Christian Identity was the safer of the two options, the district court held that not recognizing it was the least restrictive means to ensure facility security.  This framing, of course, implicates the requirement that the Department show it considered alternatives before denying plaintiffs' request.  But the Department's own policy and lack of individualized inquiries in this matter demonstrate options more than an either/or decision.

Begin with the Department's "policy directive" for "religious beliefs and practices of prisoners." It plainly does not allow unfettered group worship simply because the Department recognizes a religion. Instead, it requires continuous staff supervision of services in Level II facilities and random staff supervision in Level I facilities; forbids inmates from guarding the door during services or engaging in "[m]ilitaristic type behavior"; notes that failure to comply with the policy can lead to ending the service or individual removal from the service; and allows the Department to "prohibit a religious practice . . . if it is a threat to custody and security." Put differently, it expressly places limits on group worship by Christian Identity adherents. The Department, however, put forth no evidence supporting why this policy was insufficient to address its concerns about facility security.

To the extent the Department faced a binary choice because its decision to recognize Christian Identity as a religion would apply to all facilities, that is a problem created by its policy. A religious accommodation cannot be denied based solely on a policy. *See Fox*, 949 F.3d at 277. So, the Department cannot hide behind the broad language of its policy that makes plaintiffs' request for recognition apply to all the Department's facilities. The Department has not explained why recognition must apply to all facilities at once. Nor has it addressed whether the policy could be changed in this or any other way to facilitate plaintiffs' request while maintaining facility security. Based on the record before us, it appears that the Department never even considered doing so.

And even if the Department did consider appropriate alternatives, it wholly failed to link its reasons to deny recognition to plaintiffs and instead justified its denial with the broad brush of Christian Identity being a racist religion that posed a potential security threat. RLUIPA nevertheless requires an individual inquiry even when group worship is the sought accommodation. *See Byrd*, 17 F.4th at 694, 699–700 ("demand[ing] a tailored inquiry that turns on the individual inmate's case" on remand even though the inmate sought permission to participate in group worship); *Haight*, 763 F.3d at 563–64. Indeed, each plaintiff testified that he was nonviolent and would prevent others from acting aggressively at group services. The Department offered silence in response—it did not, for example, present any evidence that plaintiffs or any other inmates who follow Christian Identity are violent. True, Bechler linked

Christian Identity to racial violence *outside* the prison setting. But nothing in the record links plaintiffs to any prison violence, racially motivated or otherwise. In short, the Department presented evidence regarding Christian Identity as a whole, but not concerning plaintiffs. In failing to conduct an individualized inquiry, the Department's decision-making process was deficient.

In an effort to counter these defects in its decision-making process, the Department pushes back on a few fronts. It faults plaintiffs for failing to prove that Christian Identity was not a security threat. But such an argument misconstrues the burden. Plaintiffs were not required to offer any potential restrictions that could further the Department's interest in facility security; the burden to show that refusing to recognize Christian Identity was the least restrictive (and given the denial at issue, the only) option to ensure facility security falls on the Department's—not plaintiffs'—shoulders. *Ramirez*, 142 S. Ct. at 1281.

The Department next contends Christian Identity is simply too dangerous to recognize. In the Department's view, recognizing Christian Identity would lead to an increase in racial tension in its facilities because it cannot prevent nonwhites from attending Christian Identity services. This concern appears to rely on an assumption that nonwhite inmates might "identify" Christian Identity as their religion under the policy and attend Christian Identity services in bad faith to increase racial tensions. Yet, the Department's own policy tempers that fear by restricting inmates to attending group religious services for only the one religion to which they belong and limiting the changing of religion to no more than twice a year. All this means that an inmate attending a Christian Identity service would not only need to change his religion, but he would also be unable to attend services for his actual religion. The Department's concerns, therefore, are already mitigated by its policy, which, on its own terms, limits Christian Identity services to those that actually practice the religion. This is not an inherently dangerous setup. And the Department has not contradicted plaintiffs' testimony that they would allow nonwhites at their services and expel any attendees who were aggressive toward others.

As for Christian Identity's connection to white supremacist groups outside the prison setting, that alone cannot fulfill the least-restrictive-means analysis. Although the record links Christian Identity to white nationalist groups, nothing in the record addresses how many

Christian Identity adherents are members of those groups. The Department has the burden to show that refusing to recognize Christian Identity is the least restrictive means to advance facility security. *Ramirez*, 142 S. Ct. at 1281. It cannot meet that burden by simply gesturing toward some Christian Identity adherents being members of white supremacist groups and rely on this court to fill in the gaps. *See Byrd*, 17 F.4th at 699–700; *Haight*, 763 F.3d at 563–64.

Because the Department failed to conduct an individualized inquiry or consider alternatives to refusing to recognize Christian Identity, the district court erred by granting judgment in the Department's favor.[1]

For these reasons, we reverse the district court's judgment and remand for entry of judgment in plaintiffs' favor.

---

[1]Because the Department failed to show that it used the least restrictive means in deciding not to recognize Christian Identity, we do not address whether doing so furthered a compelling government interest. We also dismiss as moot plaintiffs' motion to take judicial notice and decline to address their evidentiary concerns regarding the admissibility of Bechler's testimony.