RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0175p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DANIEL STEWART; RACHEL KOSOFF,

        *Plaintiffs-Appellants/Cross-Appellees*,

    *v.*

DAVID W. MARTIN, individually and in his official capacity as Trustee of the Declaration and Agreement of Trust of May 15, 2020,

        *Defendant-Appellee/Cross-Appellant*,

BETSY MARTIN SMITH; JANET BERTOLINO; SUSAN WEINERT,

        *Defendants-Appellees*.

> Nos. 24-3648/3708

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Dayton.
No. 3:21-cv-00089—Thomas M. Rose, District Judge.

Argued: May 8, 2025

Decided and Filed: July 7, 2025

Before: CLAY, THAPAR, and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Steven F. Pflaum, NEAL, GERBER & EISENBERG LLP, Chicago, Illinois, for Appellants/Cross-Appellees. Philip D. Williamson, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, for Appellee Cross-Appellant. **ON BRIEF:** Steven F. Pflaum, Joshua Hart Burday, NEAL, GERBER & EISENBERG LLP, Chicago, Illinois, Jeffrey R. Rosenberg, IFMK LAW, LTD., Northbrook, Illinois, for Appellants/Cross-Appellees. Philip D. Williamson, Annie M. McClellan, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, Glen R. McMurry, TAFT, STETTINIUS & HOLLISTER LLP, Dayton, Ohio, Aaron M. Bernay, Ryan W. Goellner, Zackary L. Stillings, FROST BROWN TODD LLC, Cincinnati, Ohio, for Appellee Cross-Appellant.

---

**OPINION**

---

THAPAR, Circuit Judge.  Lester Martin was a renowned pediatric surgeon at Cincinnati Children's hospital.  He served in World War II, trained a generation of doctors, and made crucial advancements in the medical field before passing away at age 96.  There's no question that Dr. Martin left quite a legacy for his family to be proud of.

Unfortunately, though, this case is not about his legacy.  Instead, it's about the material goods he left behind.  And those goods have led to a long and protracted family feud.

Here, we address two parts of that saga.  Did the district court have jurisdiction to hear a dispute about who should get what?  And did two of Lester's grandkids need experts to show they didn't get what they were owed?

I.

A.

Lester Warren Martin passed away on March 13, 2020, at age 96.  A World War II veteran and a graduate of Harvard Medical School, Dr. Martin was an accomplished physician at the Cincinnati Children's Hospital, one of the world's best youth hospitals.  Among Dr. Martin's contributions to medicine was his development of a procedure called the "Lester Martin Pull Through Method," a surgical technique that eliminated the need for children with ulcerative colitis to use ostomy bags.  He also performed Ohio's first successful kidney transplant, which took place in 1965.

Dr. Martin was also a successful investor.  He read the *Investor's Business Daily* publication every morning until his death.  An "avid" manager of his finances, Dr. Martin accumulated millions of dollars in wealth.  R. 143, Pg. ID 2249.  To prepare for the distribution of these funds upon his death, he created an estate plan in 1990.

The centerpiece of Lester's[1] estate plan was a revocable trust. A revocable trust functions like a will. It provides instructions for how to distribute the donor's property after he dies. And a revocable trust is, unsurprisingly, revocable—meaning that Lester was free to cancel the trust or change its terms whenever he wanted. Because it gives the donor flexibility without any of the drawbacks of a traditional will (including the time and expense of going through probate court), the revocable trust has "emerged as the successor to the will as the centerpiece in contemporary estate planning." Robert H. Sitkoff, *Trusts & Estates: Implementing Freedom of Disposition*, 58 St. Louis Univ. L.J. 643, 655 (2014).

Lester had five children. The plan was for each child to get an equal share of Lester's trust assets upon his death. But in 2011, one of Lester's daughters, Sarah Stewart, passed away. That meant that Sarah's two children—Daniel Stewart and Rachel Kosoff—stepped into their mother's shoes as a trust beneficiary. They were each supposed to receive half of Sarah's share.

The following chart, taken from the appellants' brief, displays the family tree:

---

[1]We mean no disrespect by the use of first names (or in the case of Dr. Martin, by not using his well-earned honorific). We use the first names here only to distinguish between the family members and make things easy on the reader.



The red boxes show the people who stood to inherit a share of Lester's wealth upon his death. Four of Lester's children—David Martin, Betsy Martin Smith, Janet Bertolino, and Susan Weinert—would each inherit a one-fifth share of the assets in Lester's trust. And Daniel Stewart and Rachel Kosoff were to split the one-fifth share that their mother would have received if she had been alive when Lester died.

The events that spawned this litigation began on February 20, 2018, when Lester was 94 years old. On that day, Lester gave his only son, David Martin, a power of attorney. This authorized David to "manage[] and conduct all [Lester's] affairs, as [Lester] could do if acting personally." R. 54-2, Pg. ID 362. Among other things, the power of attorney allowed David to withdraw money from Lester's trust and distribute it to Lester's children and grandchildren. Lester also installed David as the trustee of the revocable trust.

David began to distribute money from Lester's trust. During the last year of Lester's life, David distributed a total of $13,930,000. Most of the money was distributed to Lester's four living children—David and his three siblings. David distributed a much smaller portion to

Daniel and Rachel, the two children of Lester's deceased daughter Sarah. All told, in the year before Lester's death, David made the following distributions from Lester's trust:

| Recipients[2] | Amount |
|---|---|
| David Martin and his four children | $3,470,000 |
| Betsy Martin Smith and her two children | $3,210,000 |
| Janet Bertolino and her three children | $3,340,000 |
| Susan Weinert and her two children | $3,210,000 |
| Daniel Stewart and Rachel Kosoff | $300,000 outright plus $400,000 in trusts[3] |

So Daniel and Rachel received a combined $700,000 from David's distributions before Lester's death—just a fraction of what the other beneficiaries received.

B.

Daniel and Rachel believed David's distributions were unlawful. So they sued in federal court. Their lawsuit alleged, among other things, that David's refusal to give them an equal share of distributions from Lester's trust was a breach of trust and a breach of his fiduciary duties as trustee. Although Daniel and Rachel accused David alone of wrongdoing, their complaint named all Lester's four surviving children and the other grandchildren as defendants, so that the court could order those relatives to surrender some of the money they received from David's

---

[2]David gave an equal amount of money to himself and his three siblings: $2,950,000 each. David also gave $130,000 to each of his and his siblings' eleven children. Because David had four children, David's family received an extra $520,000 ($130,000 for each child)—meaning that David's family received a total of $3,470,000. Betsy and Susan each had two children, and thus received $3,210,000 ($2,950,000 plus $260,000). Janet's three children received a total of $390,000, bringing Janet's family's total to $3,340,000.

[3]This box includes both (1) $300,000 that David distributed directly to Daniel and Rachel and (2) $400,000 that David placed in restrictive trusts that gave Daniel and Rachel the right to withdraw 5% of the total trust corpus every year.

distributions.  The basis for federal jurisdiction was diversity of citizenship.  *See* 28 U.S.C. § 1332(a).**4**

After a flurry of motions, the district court held that David had breached his fiduciary duties to the plaintiffs.  The court's theory was that, under the terms of the trust, David could make distributions from Lester's trust only if Lester had directed him to do so "in writing."  R. 77, Pg. ID 1297 (quoting R. 54-1, Pg. ID 328).  But the court concluded that Lester never created a formal writing that directed David to make the specific distributions that the plaintiffs challenged.  To be sure, Lester had given David a power of attorney authorizing David to make distributions from the trust.  Yet the court believed that this written *authorization* to make distributions didn't satisfy the trust's demand for a written *direction* to make a particular distribution.

Finally, the court acknowledged that, since David could act both in his own capacity as trustee and in Lester's capacity as settlor (since Lester gave David a power of attorney), David could have issued a written direction to himself to make the distributions.  David never did that, believing that Ohio law would not require him to go through a pointless exercise of issuing a written direction to himself to do something.  But the court held that Ohio law did require that.  Ultimately, in the court's view, David's distributions without specific written authorization amounted to breaches of trust and breaches of David's fiduciary duties to Daniel and Rachel.

---

**4** The two plaintiffs, Daniel and Rachel, are citizens of Massachusetts and Wisconsin, respectively.  The complaint alleged that all fifteen defendants were citizens of states other than Massachusetts or Wisconsin.  If that were true, then diversity jurisdiction would have been proper, since each plaintiff would be completely diverse from each defendant.  But the non-trustee defendants' answer admitted the citizenships of only thirteen of the fifteen defendants.  The defendants denied that the plaintiffs had accurately identified the citizenships of two of the defendants—Christina Martin and Chris Smith.  As best we can tell, nobody ever raised the issue of these two defendants' citizenships as the litigation proceeded.  The court's failure to make a factual finding about these defendants' citizenships raises the possibility that Christina Martin or Chris Smith might have been a citizen of Massachusetts or Wisconsin—which would have meant the parties were not diverse, destroying the court's jurisdiction over the case.  Eventually, though, the district court dismissed Christina Martin and Chris Smith from the action.  Dismissing these potentially "diversity-destroying" defendants cured any jurisdictional defect.  *Grupo Dataflux v. Atlas Glob. Grp.*, 541 U.S. 567, 573 (2004).  So the district court properly exercised diversity jurisdiction over this case, and so do we.

Based on these conclusions, the court entered summary judgment for the plaintiffs, as to liability only, on their breach of trust and breach of fiduciary duty claims. The court dismissed the plaintiffs' remaining claims, most of them at the plaintiffs' request.

That left one final step: a jury trial to determine the amount of damages David owed Daniel and Rachel. After a two-day trial, a jury came to an answer: $2,086,000. How did the jury arrive at that sum? It was one fifth of the amount David had distributed from Lester's trust, less the $700,000 that Daniel and Rachel had already received. The court entered a final judgment that reflected the jury's verdict.

A few weeks after the court entered its judgment, the litigation took an unexpected turn. David filed a motion for relief from the court's judgment under Rule 60(b)(4) of the Federal Rules of Civil Procedure, asserting that the court's judgment was void. He didn't argue that the court made legal errors in resolving the merits of the plaintiffs' claims. Instead, David argued something much more fundamental: that the court lacked the power to decide the case in the first place. David claimed that Ohio law didn't give the plaintiffs a legal right to sue him for breaches of trust. So he reasoned that the plaintiffs lacked constitutional standing to sue in federal court—which in turn meant that the district court lacked "judicial Power" to hear the lawsuit. U.S. Const. art. III., § 1.

The district court granted David's motion. It concluded that Ohio law didn't give the plaintiffs a right to contest David's distributions of money from Lester's trust. The court also said that this limit meant the plaintiffs lacked constitutional standing to bring their claims in federal court. So the court wiped out the jury's verdict and dismissed the case.

Daniel and Rachel appealed. For his part, David filed a "protective cross-appeal" in case we disagree with his primary arguments. If we reverse the district court's grant of the Rule 60(b)(4) motion, David asks us to entertain his appeal of some of the district court's earlier rulings, which held that the plaintiffs didn't need an expert witness to prove the amount of their damages.

II.

Daniel and Rachel have Article III standing to bring their claims in federal court.  Thus, the district court erred in granting David's Rule 60(b)(4) motion for relief from judgment.

A.

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  First, the plaintiff must have suffered an "injury in fact" that is real and concrete, not merely hypothetical.  *Id.*  Second, the injury must be traceable to the defendant's challenged action.  *Id.*  Third, the injury must be redressable by a favorable judicial decision.  *Id.* at 561.

The plaintiffs have established all three elements of constitutional standing.  First, they alleged an injury in fact:  the loss of $2,086,000.  That is a "monetary injury" that "readily qualif[ies]" as a "concrete injury in fact under Article III."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).  Second, this injury was traceable to David's distribution of funds from Lester's trust, which the court said was unlawful.  Finally, the plaintiffs' monetary harm is easily redressable by the court's judgment ordering David to pay $2,086,000 to the plaintiffs.  In short, this case is a prime example of a genuine controversy that the Constitution authorizes the federal courts to hear.

B.

David's counterargument proceeds in two parts.  First, he argues that Ohio law doesn't give the plaintiffs a right to challenge David's distributions as a breach of fiduciary duties.  And second, he asserts that, because Ohio law doesn't authorize those claims, the plaintiffs lack Article III standing to bring the claims in federal court.  Ultimately, David might be correct that Ohio law doesn't provide the plaintiffs a cause of action to contest his distributions as a breach of fiduciary duty.  But that question is irrelevant to the Article III standing analysis.

1.

Start with David's first premise:  that under Ohio law, the plaintiffs don't have a cause of action to allege that David's distributions from Lester's trust breached his duties.  This argument

has some force. Recall that, during Lester's lifetime, his trust was revocable. It's well established that "the trustee of a revocable trust does not owe fiduciary duties to the beneficiaries." Sitkoff, *supra*, at 655; *see also* Restatement (Third) of Trusts § 74. In fact, the beneficiaries don't have any legal rights to the trust property, so long as the trust remains revocable. Restatement (Third) of Trusts § 74. That makes sense, since a revocable trust is "little more than a nonprobate will." Sitkoff, *supra*, at 656. Just as a person who stands to benefit from a donor's will doesn't have legal recourse if the donor subsequently removes that person from his will, the beneficiary of a revocable trust can't complain of a breach of duty if the settlor depletes the trust funds before his death.

Ohio appears to endorse this view of revocable trusts. Ohio has enacted a version of section 603(b) of the Uniform Trust Code, with modifications not relevant here. Ohio Rev. Code Ann. § 5806.03. That provision states that, when a trust is revocable, the "rights of the beneficiaries are subject to the control of" the settlor. *Id.* § 5806.03(A). In this case, that's Lester—and by extension, David, who had a power of attorney to act on Lester's behalf. *See id.* § 5806.03(B). As for the trustee (David), his duties were "owed exclusively to" Lester—not to Daniel or Rachel, the beneficiaries. *Id.* § 5806.03(A). On this view, David had "no obligation to the beneficiaries" of Lester's trust during Lester's lifetime. *Hasselbring v. Bernard*, 139 N.E.3d 1285, 1287 (Ohio Ct. App. 2019); *see also Osborn v. Griffin*, 865 F.3d 417, 442 (6th Cir. 2017) (explaining that "[u]nder Ohio law, trustees of revocable trusts owe fiduciary duties only to the trust's settlor, and not to any of its beneficiaries").

So David's first premise might be correct. Ohio law might not give the plaintiffs a cause of action to sue David for breach of fiduciary duties.

2.

But we don't need to definitively resolve that issue, since it's irrelevant to the narrow legal question that's before us on appeal. Even if the plaintiffs lacked a cause of action to challenge David's distributions, the district court had subject-matter jurisdiction to decide this case.

a.

David's key mistake is conflating the plaintiffs' right to sue under Ohio law with the requirement of constitutional standing. "It is firmly established" that "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction"—that is, "the courts' statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (emphasis in original).

The Supreme Court illustrated this distinction in *Lexmark International, Inc. v. Static Control Components*, 572 U.S. 118 (2014). There, the Court considered Static Control's claim that Lexmark committed false advertising in violation of a federal statute. *Id.* at 122. The Court separated the analysis into two distinct questions. First, did Static Control have Article III standing to sue Lexmark? And second, did federal law give Static Control a cause of action to sue Lexmark?

The first question was easy. With just a paragraph of analysis, the Supreme Court concluded that Static Control plainly satisfied the Article III standing requirements. *Id.* at 125. Static Control alleged that Lexmark caused Static Control to suffer "lost sales and damage to its business reputation," which was enough to satisfy the "irreducible constitutional minimum of standing." *Id.* (citation omitted).

But that question was distinct from whether Static Control had a cause of action under federal law. *Id.* at 128. The Supreme Court recognized that Article III standing doesn't turn on the presence or absence of a cause of action. Indeed, Static Control's claim presented "a case or controversy that [was] properly within federal courts' Article III jurisdiction," whether or not Congress had authorized it to sue. *Id.* at 125.

Our court has continually observed the distinction between standing and causes of action. In *Charlton-Perkins v. University of Cincinnati*, we explained that even if a plaintiff lacks a cause of action, he might still have a redressable injury sufficient to satisfy Article III. 35 F.4th 1053, 1058 (6th Cir. 2022). The *Charlton-Perkins* court explained that "whether a plaintiff can get into federal court under Article III—a jurisdictional question—is not determined by whether he can also plausibly plead the elements of a cause of action—a merits question." *Id.* at 1058–

59. And in *CHKRS, LLC v. City of Dublin*, we reiterated that "just because a plaintiff's claim might fail on the *merits*," that "does not deprive the plaintiff of *standing* to assert it." 984 F.3d 483, 489 (6th Cir. 2021) (emphases in original). If the rule were otherwise, "every losing claim would be dismissed for want of standing." *Id.* (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092 (10th Cir. 2006) (en banc)).

So, whether a plaintiff has a right to legal relief on the merits doesn't affect whether a plaintiff has constitutional standing. And here, Daniel and Rachel have constitutional standing because they satisfy the three-part *Lujan* test. Even if the court erred in concluding that Daniel and Rachel have a cause of action under Ohio law (a matter on which we take no position), the district court didn't err when it exercised subject-matter jurisdiction over the case.

b.

Nor did *Steel Co.* recognize an exception to this rule for claims that are "wholly insubstantial and frivolous." *Steel Co.*, 523 U.S. at 89 (quoting *Bell v. Hood*, 327 U.S. 627, 683 (1946)). *Steel Co.* simply explained that frivolous federal-law claims can't present the sort of federal-law question necessary to support "arising under" jurisdiction, also known as federal-question jurisdiction. *See* 28 U.S.C. § 1331. That lesson about federal-question jurisdiction doesn't have anything to do with constitutional standing under Article III.

In *Steel Co.*, an environmental organization sued a manufacturing company for alleged violations of the federal Emergency Planning and Community Right-To-Know Act of 1986. *Steel Co.*, 523 U.S. at 86. One question was whether the plaintiff had Article III standing to bring its lawsuit. *Id.* The Supreme Court held that the plaintiff didn't. *Id.* at 109–10.

Before it turned to the standing question, though, the Court paused to consider a separate, threshold issue: Was the dispute over whether the plaintiff had a cause of action a merits question that could only be resolved if the plaintiff had standing? Or was it a jurisdictional question that could be answered before the standing question? *Id.* at 89.

Writing for the Court, Justice Scalia explained that the absence of a valid cause of action "does not implicate subject-matter jurisdiction." *Id.* The Court then identified an exception to

that rule. When a plaintiff presents a federal claim, a court can dismiss that claim for lack of subject-matter jurisdiction only when it is "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous." *Id.* (quoting *Bell*, 327 U.S. at 682–83). This exception is sometimes called the "substantiality doctrine." And it applies only to dismissals for lack of federal-question jurisdiction under 28 U.S.C. § 1331, not standing. Under the substantiality doctrine, when a plaintiff brings a claim that appears to arise under federal law—but the federal claim is frivolous—courts say the claim doesn't raise the sort of legitimate federal-law question that can support federal-question jurisdiction. Richard H. Fallon, Jr., et al., *Hart & Wechsler's The Federal Courts and the Federal System* 818 (7th ed. 2015); 13D Wright & Miller, *Federal Practice & Procedure* § 3564.

*Steel Co.* invoked this federal-question-specific rule when it said that frivolous claims may be dismissed for lack of jurisdiction. The cases *Steel Co.* cited in its discussion of frivolous claims all considered the substantiality of a federal question to determine whether federal-question jurisdiction could lie.[5] *Steel Co.*, 523 U.S. at 89. And as *Steel Co.* summarized, dismissal for lack of subject-matter jurisdiction "because of *the inadequacy of the federal claim*" is proper only when the claim is wholly frivolous. *Id.* (emphasis added). Ultimately, the Court explained that the plaintiff's federal-law claim was not "frivolous or immaterial," meaning that the plaintiff had presented a valid federal question within the Court's "arising under" jurisdiction. *Id.* at 89–90. The Court then held that the plaintiff lacked Article III standing—without considering the "wholly insubstantial or frivolous" exception to federal-question jurisdiction. *Id.* at 109–10.

Under this reading of *Steel Co.*, the "wholly insubstantial or frivolous" principle has no application to this case. After all, Daniel and Rachel didn't invoke the district court's federal-question jurisdiction. They didn't bring a federal-law claim. Instead, they brought state-law

---

[5]*Bell*, 327 U.S. at 682–83 (explaining that an "alleged claim under the Constitution or federal statutes" may be dismissed when it is patently frivolous); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 285 (1993) (holding that a federal-law claim was not so wholly frivolous as to eliminate federal-question jurisdiction); *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25–26 (1913) (Holmes, J.) (same); *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666–67 (1974) (same); *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 359 (1959) (same).

claims under the district court's diversity jurisdiction.  And when a plaintiff satisfies Article III's justiciability requirements (like standing) and satisfies the requirements for diversity jurisdiction, federal subject-matter jurisdiction is proper—regardless of whether the legal theory of relief is frivolous under state law.

It is true that some circuit courts have extended *Steel Co.*'s "wholly frivolous" principle to the standing context.  These courts have held that a plaintiff may lack standing when he presents a claim that is frivolous on its face.  Take, for example, a plaintiff who asserts that he's been "injured" because he has "become upset by reading about" the damage done to a "fine old vineyard in Burgundy by a band of marauding teetotalers."  *Aurora Loan Servs. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006) (Posner, J.) (citation omitted).  His claimed injury would be frivolous.  Any court would immediately recognize that the claimed injury—sadness caused by reading about events that happened in a faraway land—is not the "sort of interest that the law protects."  *Id.*; *cf. Hagans v. Levine*, 415 U.S. 528, 541 (1974) (stating that for a claim to be frivolous, it must be "so patently irrational as to require no meaningful consideration").[6]

But this is a very limited exception, and courts should be wary before employing it.  *See CHKRS, LLC*, 984 F.3d at 489.  As we recently pointed out, courts have an independent obligation to raise jurisdictional issues.  *Id.*  If the merits of a claim are jurisdictional, that would force courts to raise defenses that a defendant may never have raised.  *Id.* at 490.  And this would put courts where they don't belong—speculating as to good defenses that may or may not have been raised (the quintessential merits portion of the lawsuit).  Thus, so long as the plaintiff's claimed legal interest isn't patently frivolous, the claim passes this very low bar.

Ultimately, whether the plaintiff's legal theory under state law is frivolous is often a different question from whether the plaintiff's claimed injury is frivolous for Article III purposes.  This case illustrates the difference.  Even if Daniel and Rachel's theory of liability under Ohio law had been frivolous, the concrete injury they claim—the loss of money—isn't.  That

---

[6]For an example of a frivolous claim, look to *Apple v. Glenn*, 183 F.3d 477 (6th Cir. 1999) (per curiam).  There, a resident of Ohio named Thomas Apple filed a § 1983 lawsuit against Chief Justice Rehnquist, Senator John Glenn, and other high-ranking government officials, arguing that the officials violated Apple's First Amendment rights by failing to respond to letters that he sent them.  Any court would immediately recognize, without even a moment's thought, that such a claim is patently frivolous.  *Id.* at 180.

monetary harm is a paradigmatic example of "the sort of interest that the law protects." *Id.*; *TransUnion*, 594 U.S. at 425. Thus, the district court had jurisdiction over their claims.

*          *          *

Because the district court erred in granting David's Rule 60(b)(4) motion to vacate the judgment for lack of subject-matter jurisdiction, we vacate the district court's order granting relief from judgment.

## III.

David also has a back-up argument, which he made in a "protective cross-appeal." *See Martin Cnty. Coal Corp. v. Universal Underwriters Ins. Co.*, 727 F.3d 589, 598 (6th Cir. 2013). He says that, if we find the plaintiffs *do* have standing (as we have), then we should still overturn the district court's original judgment. Why? He argues the plaintiffs were required, but failed, to use expert testimony to prove their damages with the certainty required by Ohio law.

### A.

As an initial matter, Daniel and Rachel suggest that David's cross-appeal is improper. But "[w]e have allowed parties to bring protective cross-appeals to be considered in the event that the appellant . . . succeeds in its own appeal." *Id.* A protective-cross appeal is appropriate when the cross-appellant is "not necessarily dissatisfied with the judgment" appealed by his adversary, but still wants a backup plan in case that judgment is reversed. *Richard v. Caliber Home Loans, Inc.*, 832 F. App'x 940, 949 (6th Cir. 2020).

This case fits the bill. David was happy with the district court's dismissal under Rule 60(b)(4). But now that we've reversed that dismissal, he wants to challenge earlier rulings of the district court. He may do so.

### B.

By the time of the jury trial, the district court had already concluded that David was liable to Daniel and Rachel for breaching his fiduciary duties. The sole question for the jury was the dollar figure that David owed Daniel and Rachel.

In Daniel and Rachel's view, the answer was "a very simple and obvious" math problem. R. 142, Pg. ID 2163. Divide the amount that David distributed ($13,930,000) by five to get $2,786,000, and then subtract the amount that Daniel and Rachel said they had already received from David ($700,000). So they asked for $2,086,000.

For his part, David argued that Rachel and Daniel didn't prove the value of the money they had already received with certainty. He argued that doing so would require Rachel and Daniel to account for the returns they had made on the $400,000 that David placed into trusts for their benefit. And he argued that, under Ohio law, Daniel and Rachel needed expert testimony to explain these complex calculations to the jury.

David advanced this theory by filing a post-trial motion for judgment as a matter of law under Rule 50(b). The district court never ruled on the merits of that motion. Instead, the court terminated that motion as moot after it granted relief from judgment under Rule 60(b)(4). Of course, now that it's clear the plaintiffs do have standing, the district court must rule on this motion. And we are a "court of review, not of first view." *Byrd v. Haas*, 17 F.4th 692, 700 (6th Cir. 2021) (citation omitted). For that reason, we decline to review David's sufficiency-of-the-evidence challenge without the benefit of a district-court ruling. So we remand this case with instructions for the district court to rule on David's Rule 50(b) motion for judgment as a matter of law.[7]

\* \* \*

We vacate the district court's grant of David's motion for relief from judgment under Rule 60(b)(4), affirm the denial of David's motion in limine, and vacate the court's denial as moot of David's motion from relief from judgment under Rule 50(b). We remand the case for proceedings consistent with this opinion.

---

[7]Although we vacate the district court's denial as moot of David's Rule 50(b) motion, we affirm the district court's denial of David's motion in limine that sought to exclude Daniel and Rachel's damages testimony. The court decided to defer resolution of that evidentiary issue until trial. That wasn't an abuse of discretion.